h ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Katherine M. Guste, an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS

Count I

In August 2007, respondent was retained to prepare a power of attorney for Anthony Perniciaro, a 63-year old nursing home resident who suffered from Huntington’s disease (“HD”).[1] At the same time, Mr. Perniciaro also asked respondent to represent him in a criminal proceeding in the Kenner Mayor’s Court arising out of his involvement in a hit and run accident. Respondent performed these services and was paid a fee by Mr. Perniciaro.
Thereafter, respondent continued to provide services for Mr. Perniciaro, including assisting him in canceling the power of attorney, taking him to the bank and running other errands with him, and packing and storing his personal and household belongings in preparation for his move from one nursing home to another. Respondent and Mr. Perniciaro did not enter into a written contract for | ¡>these services, but agreed that respondent would be paid an hourly fee of $125, the same fee she charged to handle legal matters.
By February 2008, the relationship between respondent and Mr. Perniciaro had become strained, and he objected to paying her hourly fee. Respondent then agreed that she would no longer provide any legal or non-legal services for Mr. Perniciaro.
After Mr. Perniciaro filed a complaint against respondent, she prepared an accounting reflecting that she had spent approximately 220 hours providing services on his behalf. The value of these services totaled $26,987.50; however, respondent acknowledged that she had received $29,000 in payments from Mr. Perniciaro.
The ODC alleged that respondent’s conduct in the Perniciaro matter violated Rules 1.5(a)(charging an unreasonable fee), 1.8(a) (a lawyer shall not enter into a business transaction with a client), 1.14 (client with diminished capacity), 8.4(a)(violation of the Rules of Professional Conduct), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct.[2]
Respondent denied any misconduct relating to her representation of Mr. Pernici-aro. Respondent testified that she was initially retained to prepare a power of attorney for Mr. Perniciaro in favor of the administrator of the nursing home where he lived. When respondent met Mr. Per-niciaro, she was told he had HD but that it was in the beginning stages. According to respondent, Mr. Perniciaro slurred his words a bit when he spoke and he occasionally tripped over things, but she said his cognitive functions were intact and “he understood everything that was going on.”
|3In the course of preparing the power of attorney, respondent met with Mr. Pernici-aro several times and reviewed several *1026 boxes of his financial documents. Once the power of attorney was executed, Mr. Perniciaro asked respondent to take copies of it to all of the banks where he maintained accounts. Respondent told Mr. Perniciaro that he did not need her to do that, but he insisted, so she agreed.[3] Respondent was paid a fee of $1,500 for her services related to the power of attorney. Mr. Perniciaro then asked respondent to handle the criminal charges against him arising out of the hit and run accident. Respondent was successful in having the charges dismissed. Mr. Perniciaro paid respondent $3,000 to handle the criminal matter.
Mr. Perniciaro subsequently began having problems with the staff at the nursing home, and came to believe that the nursing home administrator was using his power of attorney to steal his money.[4] At Mr. Per-niciaro’s request, respondent canceled the power of attorney, and she was able to make arrangements to have Mr. Perniciaro transferred to another nursing home. Mr. Perniciaro then requested that respondent help him with other personal matters, like shopping and packing up his personal belongings to be moved into storage or to the new nursing home. Respondent testified that she told Mr. Perniciaro her hourly fee was $125 and that he could find somebody else to do personal things for him, but he told her that he had money and was not concerned about her fee. Respondent denied that Mr. Perniciaro was not “in his right mind” when he made this decision, stating that “he knew exactly what he was doing.” Respondent also believed that Mr. Perniciaro trusted her, and so she felt she just “couldn’t tell him no.”
14At the conclusion of her relationship with Mr. Perniciaro, respondent prepared an accounting covering the power of attorney, the criminal matter, and the other services he requested she perform. Respondent completed this accounting by referring to entries in her desk calendar. The July 8, 2008 accounting reflected that Mr. Perniciaro paid respondent a total of $29,000 and that she performed 215.9 hours of services (both legal and non-legal) at $125 per hour, for a total of $26,987.50. Respondent testified that the accounting did not include 4.98 hours of telephone calls from Mr. Perniciaro that were documented in records from her cellular telephone provider. Nevertheless, respondent admitted that she was overpaid by Mr. Perniciaro and that she “probably” owes him a refund.

Count II

In February 2008, Craig Conners retained respondent to handle his divorce and ancillary matters. Respondent was paid a total of $3,500 for representing Mr. Conners, of which $500 was intended for court costs. Respondent did not deposit any portion of these funds into her client trust account.
By April 2009, Mr. Conners had become frustrated with respondent’s lack of communication regarding his legal matters. He therefore sent respondent a letter terminating her representation and requesting a detailed accounting of the services she had performed on his behalf. In June 2009, Mr. Conners sent respondent another letter reiterating his request for an accounting and also requesting that his file be sent to his new attorney.
In July 2009, when respondent still had not complied with Mr. Conners’ requests, he filed a complaint against her with the *1027 ODC. In her August 2009 reply to the complaint, respondent indicated that she had prepared pleadings and performed other legal services for Mr. Conners. Respondent also stated that she would forward copies of Mr. Conners’ entire file as well as a complete accounting; 15h owe ver, she did not do so until May 2011, when the hearing was held on the formal charges.[5]
The ODC alleged that respondent’s conduct in the Conners matter violated Rules 1.4 (failure to communicate with a client), 1.5(f)(payment of fees in advance of services), 1.15 (safekeeping property of clients or third persons), 1.16 (obligations upon termination of the representation), and 8.4(a) of the Rules of Professional Conduct.
In the Conners matter, respondent conceded that she was at fault for not immediately withdrawing from Mr. Conners’ case when he terminated her representation, and that she had delayed in returning his file. However, respondent denied any other misconduct.
DISCIPLINARY PROCEEDINGS
In July 2010, the ODC filed two counts of formal charges against respondent. Respondent answered the formal charges and denied any misconduct. This matter then proceeded to a formal hearing on the merits.

Hearing Committee Report

After considering the testimony and evidence presented at the hearing, the hearing committee made the following factual findings:
In Count I, the committee found that when respondent began representing Mr. Perniciaro in August 2007, he had been diagnosed with HD and lived in a nursing home. Respondent testified that Mr. Per-niciaro was very paranoid. By IfiNovember 2007, he had difficulty with speech and walking and could not buckle a seat belt. At one point, he was hysterical about getting out of the nursing home.
Respondent represented Mr. Perniciaro from August 2007 until mid-February 2008. She did not have a written contract with Mr. Perniciaro and did not provide billing statements to him. No contemporaneous record keeping of hours expended was done; rather, only after the ODC’s inquiry did respondent attempt to “reconstruct” the number of hours she may have expended by reviewing her desk calendar. Respondent was paid approximately $30,000 by Mr. Perniciaro and admits that she was overpaid. None of these funds were deposited into respondent’s client trust account.
Respondent represented Mr. Perniciaro related to a traffic accident and drafted a power of attorney for him. Respondent produced only her notes to support her fee, but no evidence such as a court docket sheet. She also produced a copy of a power of attorney but admitted that it was not the actual document signed by Mr. Perniciaro. Respondent was paid approximately $4,500 for those services.
Respondent’s additional “representation” of Mr. Perniciaro consisted, according to her own testimony, of chauffeuring services and other assistance as detailed in her billing statement. Respondent was aware that she was billing at a rate of $125 per hour for non-legal services. In February 2008, Mr. Perniciaro objected to respondent’s billing rate.
*1028 Based on these factual findings, the committee concluded that respondent violated Rules 1.5(a), 1.14, 8.4(a), and 8.4(c) in the Pernieiaro matter. The committee also found a violation of Rule 1.15, which was not charged in the formal charges. The committee did not find clear and convincing evidence that respondent entered into an improper business transaction with her client, in violation of Rule 1.8(a).
17In Count II, the committee found that respondent represented Mr. Conners in a divorce proceeding from February 2008 to mid-April 2009. Mr. Conners had difficulty communicating with respondent, and eventually told her he no longer wanted her to represent him. He also asked her to send his file to his new attorney. Respondent admitted that she failed to withdraw from the case and failed to return Mr. Conners’ file for more than two years, despite repeated requests. She also did not provide the file to the ODC, although she had promised to do so. Respondent finally provided the file to Mr. Conners at the May 4, 2011 formal charge hearing, along with her accounting.
The accounting was not prepared contemporaneously with the services rendered to Mr. Conners, but rather was prepared in March 2011, shortly before the formal charge hearing. Respondent did not explain why the statement did not include $500 of the $3,500 she was paid, purportedly for court costs. Only $321 was referenced on the statement for filing fees. Respondent asserted a claim for additional fees for conversations with Mr. Conners that were not listed on the statement. Further, she admitted that she placed all of the funds she received from Mr. Con-ners into her operating account, rather than her trust account.
Based on these factual findings, the committee concluded that respondent violated Rules 1.4, 1.5(f), 1.15, 1.16, and 8.4(a) in the Conners matter.
Turning to the issue of an appropriate sanction, the committee determined that respondent knowingly violated duties owed to her clients, the public, the legal system, and the profession. Her conduct caused actual harm to Mr. Pernieiaro and to Mr. Conners. The committee determined that the applicable baseline sanction is disbarment based on the ABA’s Standards for Imposing Lawyer Sanctions.
lain aggravation, the committee found only that respondent has a prior disciplinary record.[6] In mitigation, the committee noted respondent’s claim of a heavy case load in connection with her employment at the Jefferson Parish Public Defender’s Office.
After further considering this court’s prior jurisprudence involving similar misconduct, the committee recommended respondent be disbarred. The committee further recommended that respondent be ordered to provide a full accounting to each of the complainants and that she refund all unearned fees as determined by an agreement between respondent and the ODC, or if they are unable to reach an agreement, as determined by an arbitrator or other neutral party.
Respondent filed an objection to the hearing committee’s report and recommendation, asserting that the committee erred in its finding of certain rule violations and that the sanction of disbarment is too harsh.

*1029
Disciplinary Board Recommendation

After review, the disciplinary board determined that the hearing committee’s factual findings are not manifestly erroneous, except the board disagreed with the committee that the ODC proved Mr. Pernicia-ro was a client “of diminished capacity.” The committee apparently based its conclusion upon the fact that Mr. Perniciaro had been diagnosed with HD. However, the ODC did not introduce any medical records, depositions of Mr. Perniciaro’s treating physicians, or expert testimony substantiating that Mr. Perniciaro was, indeed, of diminished capacity at the pertinent time. According to the general information in the record about HD, it is a progressive disease which may affect a patient’s judgment and other cognitive 13functions, depending upon the stage to which the disease has progressed as well as a multitude of other factors. However, without a report or testimony from Mr. Perniciaro’s treating physicians, the ODC failed to establish the extent to which Mr. Perniciaro’s mental capacity was actually affected by HD at the time he was represented by respondent. The board declined to assume that Mr. Perniciaro was of diminished capacity simply because he had been diagnosed with HD.[7]
The board made the following findings concerned the alleged violations by respondent of the Rules of Professional Conduct:
In Count I, the board found respondent violated Rule 1.5(a), which requires that a lawyer’s fee be reasonable. Respondent billed Mr. Perniciaro for 215.9 hours of work at a rate of $125 per hour. However, respondent worked on legal matters for Mr. Perniciaro (the hit and run accident and the power of attorney) for only eight hours; the remaining hours were spent providing non-legal services. Respondent also committed a dishonest act in violation of Rules 8.4(a) and 8.4(c) by charging her legal hourly rate for six months of menial non-legal services. The board found respondent did not violate Rules 1.8(a), 1.14, or 1.15 in the Perniciaro matter.
In Count II, the board found respondent violated Rule 1.4 by failing to reasonably communicate with her client. While the two parties have different opinions concerning the level of communication that took place between them, the committee found Mr. Conners’ version of the story to be more credible and concluded that respondent violated Rule 1.4. The board agreed, noting that respondent was retained in the matter in February 2008, but Mr. Conners had to hire another lawyer to finalize his divorce and did not receive his file or even a billing statement until March 2011.
hnThe board found respondent violated Rule 1.5(f), which requires a lawyer to promptly refund the unearned portion of an advance fee when a fee dispute arises with the client. Mr. Conners initially paid respondent $2,500 in February 2008 to handle his divorce. On January 9, 2009, he gave her an additional check for $1,000. Unhappy with respondent’s services, Mr. Conners terminated her representation in April 2009. Respondent had not completed the divorce proceedings by this time, and therefore she owes Mr. Conners some portion of the $3,500 fee he paid. Accordingly, the board agreed that respondent violated Rule 1.5(f).
The board found respondent violated Rule 1.15(e), which requires a lawyer to maintain disputed fees in a trust account until such time as the dispute is resolved. Here, Mr. Conners disputed respondent’s fee in writing on multiple occasions, but *1030 respondent failed to hold these funds in trust pending a resolution of the matter.
The board found respondent violated Rule 1.16 by failing to withdraw as counsel of record after Mr. Conners requested that she do so. She also failed to refund the unearned portion of the fee she was paid, and failed to return Mr. Conners’ file to him until the day of the hearing.
The board determined respondent violated duties owed to her clients, the legal system, and the profession, causing actual financial harm to both Mr. Perniciaro and Mr. Conners. By its very nature, respondent’s conduct was knowing and intentional. Considering the ABA’s Standards for Imposing Lawyer Sanctions, the board determined the baseline sanction is suspension.
In aggravation, the board found the following factors: prior disciplinary offenses, a dishonest or selfish motive, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victim, substantial experience in the practice of | ulaw (admitted 1995), and indifference to making restitution. The board found no mitigating factors are present.[8]
Turning to the issue of an appropriate sanction, the board noted that a wide range of sanctions may be imposed for charging an excessive fee, with the case law supporting a public reprimand to disbarment. However, the board felt a suspension was the most appropriate sanction here. Respondent overcharged Mr. Perni-ciaro for both legal and non-legal work performed, and she failed to refund unearned fees to Mr. Conners, among other misconduct. Given these circumstances, and considering the lack of mitigating factors, the board concluded that a two-year suspension is warranted.
Based on this reasoning, the board recommended that respondent be suspended from the practice of law for two years. The board further recommended that respondent be ordered to make restitution to the heirs of Mr. Perniciaro and refund unearned fees to Mr. Conners.
Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Banks, 09-1212 (La.10/2/09), 18 So.3d 57.
112After reviewing the record, we find it is clear that in the Conners matter, respondent failed to communicate with her client, failed to withdraw from the representation when she was discharged, failed to provide an accounting or refund the unearned portion of the fee she was paid, and failed to return the client’s file in a timely fashion. Therefore, we accept the board’s conclusion that respondent’s conduct with regard to this count violates Rules 1.4, 1.5(f), 1.15(e) and 1.16 of the Rules of Professional Conduct.
The more difficult question presented is the nature of respondent’s actions in the Perniciaro matter. It is undisputed that respondent was initially retained in August 2007 to handle two legal matters for Mr. Perniciaro, namely the preparation of a power of attorney and representing him in *1031 a criminal case in the Kenner Mayor’s Court. However, the nature of respondent’s actions beyond these two matters, which account for the bulk of the fees respondent charged to Mr. Perniciaro, is in dispute. Respondent characterizes these other actions as purely personal services which cannot be regulated under the Rules of Professional Conduct. In contrast, the ODC asks us to find these services were in the nature of legal services as shown by the fact that respondent billed Mr. Pernici-aro for these services at her usual legal rate of $125 per hour.
At the outset, we accept the factual findings of the board that the ODC failed to establish Mr. Perniciaro was a client of diminished capacity during the time frame in question. We further accept the finding that respondent did not enter into any prohibited business transactions with Mr. Perniciaro. Against this backdrop, the issue presented to us is whether an attorney and client may enter into an agreement whereby the attorney provides both legal and non-legal services for a specified fee.
This issue is res novo in Louisiana. However, we draw some guidance from Cincinnati Bar Ass’n v. Alsfelder, 103 Ohio St.3d 375, 816 N.E.2d 218 (2004). In Alsfelder, the 11sattorney was retained by a client in connection with litigation involving a trust. The client often contacted the lawyer three, four, or more times a day, usually during business hours, but sometimes at night. The client’s communications, however, did not always require legal advice. Instead, the lawyer and his client regularly discussed her personal concerns, frequently also meeting in person, sometimes for lunch or dinner, for these conversations. The attorney charged his client for these discussions, explaining to her that he had only an “attorney’s time” to give. In finding the attorney charged an excessive fee, the Supreme Court of Ohio stated:
We agree that an attorney may not serve in “a self-appointed role as a para-clete, comforter, helper, or hand holder, under the guise of legal services and at a lawyer’s compensation rate.” Stanley v. Bd. of Professional Responsibility (Tenn.1982), 640 S.W.2d 210, 213.
* * *
The decision to advise a client concerning nonlegal issues and accept compensation for that advice is not a bright-line test, but the propriety of this conduct may be assessed by applying the standard of a reasonable attorney in the same situation. John M. Burman, Advising Clients About Non-Legal Factors (Feb. 2004), 27 Wyoming Lawyer 40. Unquestionably, respondent did not act as a reasonable probate and business lawyer in basically befriending his unsophisticated client and charging for his “attorney’s time” to do it. He admits in hindsight that he should have terminated their retainer agreement for his client’s welfare.
The crux of the Alsfelder holding is that there is a clear danger of overreaching when an attorney blurs the line between legal and non-legal services. We find the facts of the instant case readily illustrate that danger. Respondent herself testified that during her six-month relationship with Mr. Perniciaro, he frequently told her that he “wanted an attorney” on a full-time basis and that because of her legal training, he trusted her to handle his affairs. It is clearly apparent from a reading of the record that Mr. Perniciaro came to rely upon 114respondent because of her position as a lawyer and that this confidence did not dissipate simply because she had concluded a court case. Thus, respondent’s ability to charge her legal rate of $125 for services which were nominally personal stemmed from Mr. Perniciaro’s implicit trust of her as a lawyer.
*1032 Under such circumstances, it is impossible to draw any line of demarcation between respondent’s legal services and personal services.[9] Rather, we must treat all fees charged by respondent to Mr. Per-niciaro as legal fees.
Having found that respondent was acting as Mr. Perniciaro’s attorney when she performed services for him from August 2007 to February 2008, we must now address the issue of whether the fee respondent collected was excessive. As previously stated, Mr. Perniciaro paid respondent a total of $29,000, and according to her accounting, she performed 215.9 hours of services (both legal and non-legal) for him at $125 per hour, for a total of $26,987.50. However, respondent could not ethically charge her client for her time as a lawyer when she was providing nonlegal services. Therefore, her fee is excessive.[10]
In determining a sanction for respondent’s actions, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The | ^discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
Respondent knowingly violated duties owed to her clients, causing actual harm. The baseline sanction for this type of misconduct is suspension. The record supports the aggravating factors found by the board, and no mitigating factors are present.
Under these circumstances, we will adopt the board’s recommendation and suspend respondent from the practice of law for two years. We further order respondent to make restitution to the heirs of Mr. Perniciaro and to refund the unearned portion of fee paid by Mr. Conners, or submit the matters to fee dispute arbitration.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Katherine M. Guste, Louisi *1033 ana Bar Roll number 23486, be and she hereby is suspended from the practice of law for two years. It is further ordered that respondent shall make restitution to the heirs of Anthony Perniciaro and shall refund the unearned portion of the legal fee paid by Craig Conners, or submit the matters to the Louisiana State Bar Association’s Fee Dispute Resolution Program. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
WEIMER, Justice, concurs in part and dissents in part and assigns reasons.
GUIDRY, Justice, dissents and assigns reasons.

. HD is a genetic brain disorder that results in the progressive loss of both cognitive functions and physical control.

. Mr. Perniciaro died before the hearing on the formal charges.

. According to respondent, Mr. Perniciaro was estranged from his family, and he relied on her to do things that did not necessarily involve the rendition of legal services.

. Mr. Perniciaro was apparently quite paranoid, but it is not clear this was necessarily related to his HD.

. Respondent’s accounting reflects that she billed Mr. Conners $125 per hour for the 32.5 hours she spent working on his legal matters, for a total of $4,062.50. Respondent testified at the formal charge hearing that she prepared this accounting in March 2011 by referring to entries in her appointment book. She also indicated that her actual time in the matter was probably more than what she included in the accounting, but stated that she used the numbers she did “because that’s what I had documented.”

. In In re: Guste, 06-0917 (La.5/26/06), 929 So.2d 1233, this court accepted a petition for consent discipline and imposed a fully deferred six-month suspension with probation for respondent's failure to communicate with her clients, failure to make reasonable efforts to expedite litigation, and failure to promptly refund unearned fees.

. The board also noted in this regard respondent’s testimony that Mr. Perniciaro was mentally sharp and knew exactly what he was doing in his dealings with her.

. The board rejected the mitigating factor of "job stress” found by the committee, noting that the ABA Standards do not recognize any such mitigating circumstance.

. We do not mean to suggest that a lawyer may never enter into an arrangement to provide purely personal services to a current or former client. For example, a lawyer who is an accomplished artist might enter into an agreement with a client to paint a portrait for the client. However, in such instances, the parties must clearly set forth the nature of the arrangement in writing and make it clear the lawyer is providing the agreed-upon service in a purely personal capacity and not as a lawyer. The lawyer should maintain appropriate records and ensure that there is no overlap between the amount charged for personal services and for the lawyer's legal services. Obviously, none of these precautions were observed in the instant case.

. The record contains a copy of a promissory note in the amount of $11,000 executed by respondent in favor of Mr. Perniciaro. Although respondent disputes the legal validity of this promissory note, she admits she executed it after Mr. Perniciaro objected to her billing rate. Under these circumstances, we find the promissory note represents an implicit acknowledgment by respondent that she owed Mr. Perniciaro a refund of a portion of the fees she charged. While we express no opinion regarding the enforceability of this promissory note, this evidence reinforces our conclusion that respondent charged an excessive fee.